FILED

2012 May-22  PM 02:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **WILLIAM KEITH WORLEY,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.: 4:11-cv-1214-RDP** |
| } | |
| **MICHAEL J. ASTRUE, Commissioner** } | |
| **of the Social Security Administration,** } | |
| } | |
| **Defendant.** } | |

## MEMORANDUM OF DECISION

On June 12, 2008, William Keith Worley ("Plaintiff"), applied for both disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"). (R. 117, 137-38). Plaintiff alleges disability commencing on October 15, 2007, because of chronic pain related to a series of work-related injuries. *Id*. The Commissioner denied both claims. (R. 117-28).

Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ"), and the ALJ held a hearing on March 2, 2009. (R. 32-40). In a decision dated May 27, 2009, the ALJ found that Plaintiff was not disabled as defined by the Act and, by extension, that Plaintiff was ineligible for DIB and SSI. (R. 28-29).

On February 9, 2011, the Appeals Council denied Plaintiff's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1-3). Plaintiff has exhausted his administrative remedies. As a result, this court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. §§

405(g) and 1631(c)(3).  Based upon the court's review of the record and the briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

## I.   ISSUES PRESENTED

Plaintiff presents three related issues for remand:  (1) Whether the ALJ properly concluded that he had the residual functional capacity ("RFC") to perform a significant number of sedentary jobs; (2) whether, in determining his RFC, the ALJ properly engaged the necessary function-by-function analysis of his work-related abilities; and (3) whether the ALJ improperly declined to contact Dr. Adam Nortick, one of Plaintiff's treating physicians, for additional evidence before reaching his decision.

## II.   STANDARD OF REVIEW

The standard of review of the Commissioner's decision is a limited one.  This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A reviewing court may not look only to those parts of the record that support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ.  *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).  As the Eleventh Circuit has counseled:

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

2

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).   While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance."   *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).   Legal standards are reviewed *de novo*.   *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

### III.   LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to:

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[1] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

To make this determination, the Commissioner employs a five-step, sequential evaluation.  *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1)   Is the person presently unemployed?
> (2)   Is the person's impairment severe?
> (3)   Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4)   Is the person unable to perform his or her former occupation?
> (5)   Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.   A negative answer to any question, other than step three, leads to a determination of "not disabled."

---

[1]A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

3

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[2]   To establish disability, a claimant

has the burden of proving the first three steps, namely that (1) he is not engaged in substantial

gainful activity, (2) he has a severe impairment or combination of impairments, and (3) his

impairment or impairments meet or exceed the criteria in the Listings found in 20 C.F.R. Pt. 404,

Subpt. P, App. 1.   If the claimant cannot prove that he has a listed impairment, he must prove

alternatively that he is unable to perform his previous work.   *Jones v. Apfel*, 190 F.3d 1224, 1228

(11th Cir. 1999); *see also Lucas v. Sullivan*, 918 F.2d 1567, 1571 (11th Cir. 1990).   Once the

claimant shows that he cannot perform his previous work, the burden shifts to the Commissioner

"to show the existence of other jobs in the national economy which, given the claimant's

impairments, the claimant can perform."   *Jones*, 190 F.3d at 1228.

Because Plaintiff alleges that one of his disabling conditions is pain, which is not a listed

impairment, the ALJ was required to apply the Eleventh Circuit pain standard to determine

whether Plaintiff is disabled by his pain and, by extension, is unable to perform previous work.

*See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).   This Circuit's pain standard requires:

(1)   evidence of an underlying medical condition *and either*
(2)   objective medical evidence that confirms the severity of the alleged pain arising from that condition; *or*,
(3)   that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Id.*   (emphasis added).   While a reversal is warranted if the ALJ's decision contains no evidence

of the proper application of the three-part pain standard, the ALJ does not have to recite the pain

---

[2]*McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a SSI case under Title II only.   The same sequence applies to DIB under Title XVI.   Cases arising under Title II are appropriately cited as authority in Title XVI cases.   *See, e.g.*, *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

standard word-for-word. *Id*. Instead, the ALJ may make findings indicating application of the standard. *Id.*

Concurrent with the Eleventh Circuit pain inquiry, the ALJ must determine the claimant's residual functional capacity ("RFC") to return to past relevant work or, alternatively, to perform any other work within the economy. 20 C.F.R. § 404.1520(a)(4)(iv)-(v); *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004). Regulations define RFC, generally, as the level of activity in which an individual may still engage despite the limitations of his or her impairments. *See* 20 C.F.R. § 404.1545(a). In determining a claimant's RFC, the ALJ is compelled to evaluate both "relevant medical evidence" and "descriptions and observations of [the claimant's] limitations." 20 C.F.R. § 404.1454(a)(3). The ALJ must use this evidence to "identify [the claimant's] functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . ." SSR 96-8p, 1996 WL 374184 (Jul. 2, 1996). Specifically, the ALJ should assess the claimant's work-related physical abilities, mental abilities, and other abilities affected by the impairments. *Id*. (citing 20 C.F.R. §§ 404.1545(b) – (d), 416.945(b) – (d)). Based on the function-by-function analysis, the ALJ then determines the claimant's RFC on a five-point Likert scale, the metrics of which are expressed in terms of exertional levels of work: sedentary, light, medium, heavy, and very heavy. *Id.*

When applying the pain standard and determining a claimant's RFC, the ALJ must give considerable weight to a treating physician's opinion. *See Crawford v. Comm'r*, 363 F.3d 1155, 1159 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). As such, if the evidence obtained from a treating physician is inadequate to sufficiently inform the pain standard and RFC inquiries, the ALJ may contact the treating physician for clarification or additional evidence. *See* 20 C.F.R. § 404.1512(e). A request for additional evidence from a physician is

5

appropriate only in the limited circumstances where (1) "the report from [the] medical source contains a conflict or ambiguity that must be resolved," (2) "the report does not contain all the necessary information," or (3) the report "does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Id.*

When the body of reports is collectively adequate, however, "the [ALJ] may reject any medical opinion," including a treating physician's, "if the evidence supports a contrary finding." *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). If the evidence supports such a contrary finding, the ALJ must articulate specific reasons for rejecting the treating physician's opinion. *See Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

If, in the final analysis, the ALJ determines that the claimant retains the capacity to return to previous work *or* to perform any other work within the economy, he must conclude that the claimant is not disabled. If, on the other hand, the ALJ determines that the claimant lacks the RFC to adjust to any level of gainful employment, the ALJ should conclude that the claimant is disabled.

## IV.   FACTS AND PROCEEDINGS BELOW

Plaintiff has a high school education and was forty-two (42) years old at the time of the administrative hearing. (R. 18, 80). His previous work experience includes employment as a heavy equipment operator, a construction laborer, and an assembly line worker. *Id.* Plaintiff alleges he is unable to work because of chronic, debilitating back pain resulting from multiple compression fractures. At the administrative hearing, Plaintiff presented evidence that he also suffers from dysthymic disorder. According to Plaintiff, his pain and related medical problems began after an on-the-job accident in 2001. *Id.*

6

### 1.      Physical Limitations

Plaintiff purports to have suffered four compression fractures to his lumbar spine while operating a pavement scraper in September 2001.[3]  (R. 226).  On November 29, 2001, Plaintiff consulted Dr. John Featheringill, an orthopedic surgeon, complaining of sudden, severe surges of back pain.  (R. 222).   Dr. Featheringill examined anteroposterior and lateral X-rays of Plaintiff's lumbosacral spine and noted one or more fractures of the lumbar vertebrae.  *Id.*  According to Dr. Featheringill, however, "all of the fractures appear[ed] to be nearly healed."  *Id.*  Dr. Featheringill ordered physical therapy to increase Plaintiff's mobilization and back mechanics. (R. 222-23).

On January 7, 2002, Plaintiff again consulted Dr. Featheringill with similar complaints of shooting pain.  Based on additional X-rays, Dr. Featheringill reported that Plaintiff's fractures appeared "well-healed."  An MRI revealed a disc protrusion, however, and Dr. Featheringill ordered a myelogram of Plaintiff's spine and a post-myelogram CT.  (R. 220-21).  On January 15, 2001, Dr. Featheringill reviewed the results of these scans with Plaintiff:  A "slight disc bulge" at L5-S1 and "residual of the fractures," but "no bone fragments," "disc ruptures," or "disc problems" in the affected areas.  *Id.*  Dr. Featheringill acknowledged Plaintiff's continued problems with "limited mobility" (R. 216) and ordered "aggressive[] rehabilitation."  *Id.*

Plaintiff resumed a limited schedule as a heavy equipment operator in February 2002. (R. 214).  On February 28, 2002, Plaintiff returned to Dr. Featheringill, claiming no improvement in

---

[3]  Plaintiff provided no records to verify the specifics of his workplace injury.  The earliest medical records in evidence date from November 2001, and are described as "follow-ups" to diagnosis and treatment of the workplace injury.  (R. 222).  Further, Plaintiff provided no records to verify his settlement of a workmen's compensation claim.  According to Plaintiff's testimony, he settled the claim for $17,000, paid outright in 2003.  (R. 89).

his pain.  *Id.*  In his report on the visit, Dr. Featheringill indicated that Plaintiff "had quite a bit of difficulty" moving about the room and concluded that Plaintiff "did not generate enough quadriceps power to support body weight."  *Id.*  Notably, though, Dr. Featheringill found this demonstration "inappropriate, and probably due to lack of effort."  *Id.*  Further, Dr. Featheringill declined to record a continued diagnosis of fractures to lumbar vertebrae.  *See id.*  Lacking any further treatment options, Dr. Featheringill recommended a neurosurgical consultation.  *Id.*

Plaintiff again returned to Dr. Featheringill on April 23, 2002, reporting severe pain while working.  (R. 212).  During the visit, Dr. Featheringill reviewed data from Dr. Johnson, a chiropractor who previously evaluated Plaintiff.  *Id.*  In his report, Dr. Featheringill concurred with Dr. Johnson, finding "no reason for the patient to have the non-anatomic complaints of pain that he has."  *Id.*  Dr. Featheringill recommended that Plaintiff seek another treating physician, and he referred Plaintiff to a pain management specialist.  *Id.*  He expressly declined to recommend vertebroplasty, noting that Plaintiff's fractures had "healed well."  *Id.*

On May 24, 2002, Plaintiff visited Dr. Robert Q. Craddock, a neurosurgeon, reporting two workplace injuries—one on September 19, 2001, and another on April 22, 2002.  (R. 226). Dr. Craddock recorded "mild restriction in [Plaintiff's] range of motion in his neck," as well as some evidence of "degenerative disc disease" and "bulging at L5-S1" from Plaintiff's scans on file.  (R. 226-27).  Based on these findings, Dr. Craddock ordered a new lumbar MRI and a new cervical MRI.  On June 13, 2002, Dr. Craddock reported that Plaintiff's "cervical spine films show degenerative disc disease [and] some bulging and osteophytes at C4-5 and C6-7, but no disc herniation or surgical lesion."  (R. 225).  Similarly, Plaintiff's MRIs showed "some disc bulging at L4-5 and L5-S1, but no herniation or any sort of surgical lesion . . . ."  *Id.*  Dr. Craddock referred Plaintiff for an epidural and pain management.  *Id.*

8

Between January and June 2006, Plaintiff made monthly visits to The Doleys Clinic, a pain and rehabilitation center.  On a scale of one to ten (ten being the worst), Plaintiff consistently reported a current pain level between four and six, a maximum pain level of seven, and a minimum pain level between three and four.  (R. 230, 232, 234, 236, 238).  Dr. Lisa Columbia, a pain specialist at The Doleys Clinic, diagnosed Plaintiff with chronic low back pain, chronic neck pain, chronic cervical spine pain, headaches, thoracic spine pain, depression, stress and anxiety, and reflex sympathetic dystrophy in the upper right extremity.  (R. 231, 233, 235, 237, 239).  To treat these conditions, Dr. Columbia prescribed a regimen of OxyContin and OxyIR.  *Id.*

On June 22, 2006, Dr. Daniel Doleys, principal clinical psychologist at The Doleys Clinic, noted that Plaintiff's monthly drug screen failed to appropriately reflect Dr. Columbia's prescription for oxycodone.  (R. 229).  Dr. Doleys also recorded improvement in Plaintiff's general condition; in turn, Dr. Doleys recommended that Dr. Columbia discontinue prescription of oxycodone products.  *Id.*

On October 5, 2007, Plaintiff presented to Christian Medical Clinics, a general and family practice, where he consulted Dr. Barry McCleney.  (R. 241).  Plaintiff complained of continuing pain and reported that he recently reinjured his back by "turn[ing] the wrong way." *Id.*  Dr. McCleney prescribed a Medrol Dosepak to reduce inflammation and Flextra DS for pain. (R. 242).  He also ordered a shot of Toradol to alleviate Plaintiff's pain in the short-term.  *Id.*  Dr. McCleney explained to Plaintiff that neither he nor his clinic handled chronic pain management, and he referred Plaintiff back to Dr. Craddock, the neurosurgeon.

After filing for DIB and SSI on June 12, 2008, Plaintiff met with Dr. James Matic, a family practitioner, for a consultative medical examination.  (R. 244-45).  Dr. Matic reviewed

9

two X-rays of Plaintiff's lumbosacral spine, noting "early degenerative changes in the form of bone spurs at L5-S1." (R. 245). Likewise, Dr. Matic identified a "decreased range of motion by one-third in all planes [of the lumbar spine] associated with moderate pain." *Id.* Apart from this limited diagnosis, however, Dr. Matic observed that Plaintiff maintained a "full range of motion" in his upper extremities, his lower extremities, and his cervical spine, as well as a normal gait. *Id.* Dr. Matic assessed Plaintiff as suffering from chronic pain, depression, sympathetic dystrophy of the left hand, and migraine headaches. *Id.*

That same day, Plaintiff also met with Dr. William Belidleman, a clinical psychologist, for a consultative psychological evaluation. (R. 247-49). Following a lengthy interview, Dr. Belidleman diagnosed Plaintiff with "dysthymic disorder, late onset," resulting from his "physical problems, as well as psychological stressors." (R. 249). Dr. Belidleman further indicated that Plaintiff's "[p]rognosis for favorable response to treatment is poor given that he is in no mental health treatment and taking no medications." *Id.* Dr. Belidleman determined Plaintiff's Global Assessment of Functioning ("GAF") score to be 58. *Id.*

On September 3, 2008, Dr. R. Glenn Carmichael, a neurologist, reviewed Plaintiff's medical records for the Disability Determination Service ("DDS"). (R. 250). According to Dr. Carmichael, Plaintiff suffers from lumbar spondylosis and early degenerative changes of the lumbar spine, resulting in some limitation of his range of motion. *Id.* Dr. Carmichael noted Plaintiff's previous diagnosis of lumbar compression fractures, as well as resolution of that diagnosis in 2002. *Id.* Based on this assessment, Dr. Carmichael recommended "medium RFC with safety precautions" to the DDS. *Id.*

10

On February 9, 2009, Dr. Adam Nortick, an emergency medicine specialist, completed a multiple-choice questionnaire prepared by Plaintiff's attorneys.[4]   (R. 282-86).   Dr. Nortick indicated that Plaintiff's pain was "virtually incapacitating" and that physical activity would likely increase Plaintiff's pain "to such an extent that bedrest [sic] and/or medication is necessary."   (R. 283).   Dr. Nortick further indicated that Plaintiff's medication would produce severe side effects; yet, Dr. Nortick failed to indicate what medications, if any, Plaintiff was taking.  (R. 284).   Dr. Nortick attested that Plaintiff's underlying medical conditions support his complaints of pain, but again, Dr. Nortick failed to offer any detailed assessment of any such underlying conditions.  *Id.*

## 2.   The Administrative Hearing

After the Commissioner denied Plaintiff's application for DIB and SSI, Plaintiff requested a hearing before an ALJ.  (R. 10-11).   At the hearing, Plaintiff confirmed that he suffered an on-the-job injury in 2001, that he was treated by emergency room physicians immediately following the injury, and that he settled the resulting workman's compensation claim in 2003.  (R. 81-83).   Plaintiff testified that he briefly returned to his job as a heavy equipment operator after his injury, but stated he "couldn't do the jobs that [his employers] were wanting [him] to do."  (R. 84).   According to Plaintiff, residual pain from his injury made it difficult for him to turn his head from side to side, sit, look behind, or maintain comfort, generally.  (R. 85).   Plaintiff confirmed that he had not attempted any type of work other than machine operation or construction since his injury.  *Id.*

_____

[4]  The worksheets are conspicuously marked with the phrase "Form Drafted and Submitted by Clark James Hanlin & Hunt L.L.C.," which is Plaintiff's counsel of record.  Apart from these worksheets, Plaintiff offered no records of, or notes from, a consultation with Dr. Nortick.

Plaintiff testified that he could drive short distances without pain.  (R. 86-87).  However, drives longer than 30 to 45 minutes cause pain in his back and shoulders.  (R. 87).  Plaintiff explained that the pain stems "from the vibrations, and moving the steering wheel . . . ."  *Id.*  Plaintiff further revealed that several years prior, the State of Alabama suspended his driver's license for failure to pay a traffic ticket; as such, he cannot legally drive.  (R. 86).

Plaintiff confirmed that he was not consulting a physician on any regular basis because of financial problems.  (R. 87).  When last he visited Dr. McCleney—in October 2007—he borrowed the cost of the visit from a relative.  *Id.*  Similarly, Plaintiff confirmed that because he could not afford any prescription medications, he treated his symptoms with a combination of over-the-counter pain relievers and home remedies, including heating pads and hot showers.  (R. 87-89).

Discussing mobility, Plaintiff indicated that he was fully able to care for his own hygiene needs and that he could dress himself without assistance.  (R. 89).  He could not get in and out of a bathtub by himself, however, and he often required help tying his shoelaces.  *Id.*

According to Plaintiff, pain radiated from his lower back up through his shoulders and neck, and down through his hips and legs.  (R. 89-91).  Further, his upper-body pain regularly culminated in a migraine headache late in the day.  (R. 91-92).  Plaintiff testified that as a result of his pain, he had difficulty sitting still, standing still, and sleeping.  (R. 93-94).  Plaintiff stated that on an average day, he could sit for 30 to 45 minutes before having to stand and move about, and he could walk for about seven minutes before having to rest.  (R. 93-94).  Through an average night, Plaintiff woke up several times as a result of his pain.  *Id.*

Plaintiff confirmed that the treatment provided by Drs. Columbia and Doleys alleviated his pain substantially, but not completely.  (R. 95).  Plaintiff indicated that he stopped taking the

OxyContin prescribed to him by Dr. Columbia "because [he] got scared of them," not because of any adverse side effects. (R. 95). Plaintiff further indicated that his condition, over time, caused him to become depressed. (R. 96).

Plaintiff testified that his fiancé, with whom he was cohabitating, was largely responsible for household maintenance, including grocery shopping, cooking, and cleaning. (R. 97-101). Plaintiff also confirmed that his fiancé's job as a retail clerk was the sole source of their household income apart from food stamps. (R. 101).

Plaintiff reported that on an average day, his pain ranked between four and six on a scale of one to ten (ten being the worst), and that he could likely lift ten pounds without additional pain. (R. 98-99, 102). Attempting to lift more than ten pounds, however, would increase pain in his lower back, he stated. (R. 102). Plaintiff also indicated that he could not stoop or squat, and that he experienced trouble climbing stairs. (R. 103). Plaintiff stated that the pain in his neck and lower back were steadily increasing over time, and that if he only had insurance, he would "get things taken care of." (R. 105).

Dr. David Head, a vocational expert ("VE"), offered testimony on (1) Plaintiff's ability to return to previous work, and (2) the type and availability of jobs Plaintiff could feasibly perform. Consulting the U.S. Department of Labor's *Dictionary of Occupational Titles*, Dr. Head reported that Plaintiff's past work as a heavy equipment operator qualified as semi-skilled and required a medium level of exertion. (R. 107). According to Dr. Head, however, these skills do not transfer below the medium exertional level or outside of the specific industry. *Id.* Dr. Head further reported that Plaintiff's past work as a construction laborer and as a furniture assembler both qualified as semi-skilled and required a heavy level of exertion. (R. 107-108). As before, though, Dr. Head determined that these skills do not transfer below the medium exertional level

13

or outside of their specific industries.  *Id.*  In turn, Dr. Head concluded that Plaintiff was not able to return to any of his past relevant work.  (R. 111).

The ALJ posed a hypothetical question regarding an individual of Plaintiff's age, education, and background who can perform a medium range of work, but who is limited to occasional bending, occasional climbing, no driving or operation of vibrating machinery, and no pushing or pulling of the upper or lower extremities.  (R. 109).  Responding to this hypothetical, Dr. Head concluded that such an individual would have no opportunity for work requiring a medium level of exertion, but that the individual would have an opportunity for a limited range of light work and a broad range of sedentary work.  (R. 109-10).  According to Dr. Head, "[e]xamples of unskilled, entry level, light jobs would include cashier; tending and off-bearing at waist level, such as on an assembly line; retail sale[s] . . . and food service."  *Id.*  In the unskilled, light range, Alabama employs more than 2,000 cashiers; more than 1,200 tending and off-bearing workers; more than 2,500 retail sales workers; and more than 1,800 food service workers.  *Id.*  Dr. Head further stated that "sedentary jobs would include non-complex clerical jobs, such as information clerk, hosting clerk, [or] telephone-answering clerk," as well as "jobs in assembly at a non-production level" and jobs in "inspecting and sorting."  (R. 110).  Alabama employs more than 2,300 non-complex clerical workers; more than 1,200 non-production assembly workers; and more than 1,000 inspecting and sorting workers.  *Id.*  According to Dr. Head, Plaintiff could perform the functions of any of these jobs.  *Id.*

The ALJ then modified the hypothetical, requiring for the individual the option for sitting and standing at will.  (R. 111).  Dr. Head responded that the need to sit for more than two hours per day would preclude all work at the light exertional level and would substantially reduce the number of available jobs at the sedentary exertional level.  *Id.*  "[A]s long as work in intervals

for 45 minutes to an hour in either posture could be tolerated," Dr. Head stated, "the number [of available sedentary jobs] would be reduced [in total] from 4,500 to 3,200." (R. 112).

The ALJ then removed the sit-stand limitation, but restricted the hypothetical individual to no bending or squatting. *Id.* Dr. Head responded that this wholesale mobility restriction would preclude *all* work. *Id.* The ALJ further questioned the availability of work that would permit an individual to lie down during work hours for periods between 45 minutes and three hours. *Id.* Dr. Head responded that this requirement also would preclude all work. *Id.* Discussing the general ten-point pain scale (ten being the worst), Dr. Head reasoned that levels six through ten would encompass "moderately-severe" and "severe pain," both of which would preclude all work activity. (R. 113).

### 3.        The Administrative Decision

On May 27, 2009, the ALJ issued a decision finding Plaintiff not disabled under Sections 216(i), 223(d), and 1614(a)(3)(A) of the Act. (R. 15). The ALJ's findings of fact and conclusions of law followed the five-step legal standard outlined in 20 C.F.R. §§ 404.1520, 416.920.

First, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since the alleged onset of his disability. (R. 28). Next, the ALJ determined that Plaintiff's conditions—chronic pain of the cervical, thoracic, and lumbar spine, headaches, reflex sympathetic dystrophy of the right upper extremity, and dysthymic disorder—qualify as severe impairments. *Id.* However, these impairments do not, either alone or in combination, manifest the specific signs and diagnostic findings required by the Listing of Impairments. *Id.*

Advancing to step four, the ALJ considered Plaintiff's subjective allegations of pain to determine whether Plaintiff maintained the RFC to perform past relevant work. (R. 24-27). The

ALJ concluded that "the evidence as a whole fails to confirm disabling limitations arising from [Plaintiff's] impairments, and his impairments are not of such severity that they could reasonably be expected to give rise to disabling limitations . . . ."  (R. 28).

In support of this conclusion, the ALJ authored an exhaustive time line of Plaintiff's relevant medical history, ultimately noting that "[n]one of [Plaintiff's] treating physicians," save Dr. Nortick, "has reported that [Plaintiff suffers from] disabling pain or limitations."  (R. 24). Moreover, the ALJ emphasized that while each of Plaintiff's treating and consulting physicians acknowledged some degree of limitation stemming from his previous injuries, each physician (again, save Dr. Nortick) expressly declined to confirm the severity of pain alleged by Plaintiff. *Id*.

The ALJ deferred heavily to the consensus of Drs. Featheringill, Johnson, and Craddock, all of whom "saw no reason for [Plaintiff] to have the non-anatomic complaints of pain that he had."  *Id.*   Likewise, the ALJ assigned considerable weight to Plaintiff's monthly self-assessments recorded by Drs. Columbia and Doleys, in which Plaintiff consistently reported a current pain level of four on a scale of one to ten (ten being the worst).  According to the ALJ, "[t]his is no more than mild to moderate pain, indicating that [Plaintiff's] pain was well controlled [sic] with medication at that time."  (R. 24-25).

In the administrative decision, the ALJ also accounted for Plaintiff's daily activities, symptoms, and treatments. Citing Plaintiff's interview with Dr. Belidleman, the ALJ emphasized that Plaintiff spent most days "trying to help around the house, watching television, doing a website, doing research on the computer, and spending time with family."  (R. 25).  Per the ALJ, "[t]hese activities are not inconsistent with the ability to perform a range of sedentary work on a sustained basis."  *Id.*   Further, the ALJ noted that Plaintiff stopped taking his prescription

16

medications of his own accord, not because of any adverse side effects.  Since June 2006, Plaintiff has, by choice, treated his pain with over-the-counter medications. *Id.*  The ALJ found these facts inconsistent with Plaintiff's allegations of frequent, severe migraine headaches and disabling pain. *Id.*

The ALJ then directly addressed the clinical assessment forms submitted by Dr. Nortick, the contents of which comprise the only evidence in support of Plaintiff's allegations of severe, disabling pain.  Evaluating this evidence, the ALJ stated:

> The only physician who has reported that [Plaintiff] had disabling pain or limitations is Dr. Nortick, but there is no evidence that he has treated [Plaintiff], nor [sic] that he has even examined [Plaintiff]. . . . Although Dr. Nortick reported in the clinical assessment of pain form and in the clinical assessment of fatigue/weakness [form] that [Plaintiff] had an underlying medical condition consistent with [the] pain and fatigue/weakness [that Plaintiff] experienced, [Dr. Nortick] did not indicate what that medical condition was.  He gave no diagnosis. He [also] reported that [Plaintiff]'s prescribed medication side effects could be expected to be severe and to limit effectiveness due to distraction, and attention, and drowsiness [sic], but [Plaintiff] takes no prescribed medication. . . .  [In turn,] I assign the opinions of Dr. Nortick little weight, because they are unsupported and inconsistent with the record as a whole.

(R. 26).

In sum, the ALJ acknowledged that the evidence supports the conclusion that Plaintiff suffers from an underlying medical condition capable of producing pain and related limitations. Viewing the record as a whole, however, the ALJ concluded that "substantial evidence . . . does not confirm [that Plaintiff suffers] disabling pain or limitations arising from those conditions, nor [sic] does it support [the conclusion] that the objectively determined medical conditions are of such severity that they could reasonably be expected to give rise to disabling pain and other limitations."  (R. 26-27).

Drawing on the testimony of Dr. Head, the VE, the ALJ ultimately concluded that Plaintiff (1) lacked the RFC to return to any past work, but (2) retained the RFC to "perform

17

sedentary work which allows him to alternate between sitting and standing; no more than occasional bending, stooping, and climbing; no driving or operation of vibrating machinery; and no pushing and pulling with the upper and lower extremities." (R. 26-29). As a result, the ALJ determined that Plaintiff is not disabled within the meaning of the Act, and he is not eligible for DIB or SSI.

## VI.   DISCUSSION

Plaintiff contends that the ALJ improperly disregarded the weight of substantial evidence in determining that he retained the ("RFC") to perform a range of sedentary work. As part of this broad contention, Plaintiff argues that (1) the ALJ improperly reached his RFC determination without engaging the necessary function-by-function analysis of Plaintiff's work-related abilities, and (2) the ALJ improperly declined to contact Dr. Nortick, one of Plaintiff's treating physicians, for additional evidence before determining Plaintiff's RFC. To the contrary, the court finds that the ALJ did, in fact, engage the necessary function-by-function analysis, and that because the full body of medical records was collectively adequate, the ALJ was not obligated to contact Dr. Nortick for additional evidence. The court further finds that the ALJ sufficiently qualified his evaluation of Dr. Nortick's records in light of substantial contrary evidence. In turn, the court concludes that substantial evidence supports the ALJ's determination of Plaintiff's RFC.

### 1.   Substantial Evidence Supports the ALJ's Function-by-Function Analysis of Plaintiff's Work-Related Abilities

Plaintiff correctly notes that the Social Security Administration has released policy interpretations dictating the required pattern of analysis for determining a claimant's RFC. *See* SSR 96-8p, 1996 WL 374184 (Jul. 2, 1996) (regarding RFC for initial claims); SSR 96-9p, 1996 WL 374185 (Jul. 2, 1996) (regarding RFC for less than a full range of sedentary work).

Specifically, Plaintiff recites that the RFC determination requires a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities."  SSR 96-9p.  Plaintiff argues, in turn, that the ALJ failed to engage this function-by-function assessment of Plaintiff's work-related abilities, and, by so doing, the ALJ committed reversible error.

The ALJ did not include in his decision a subsection titled "Function-by-Function Analysis;" nevertheless, the sum and substance of the ALJ's opinion shows that the ALJ responded thoroughly to the required inquiries.  The ALJ exhaustively covered Plaintiff's physical and mental *limitations* through the lengthy discussion of Plaintiff's relevant records and testimony, and the ALJ sufficiently covered Plaintiff's physical and mental *abilities* through the discussion of Dr. Head's VE testimony.

Rulings 96-8p, 96-9p, and their progeny merely require that the ALJ's opinion demonstrate consideration of all the evidence relevant to Plaintiff's work-related abilities.  *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam).  Just as the ALJ need not "specifically refer to every piece of evidence in his decision," he need not expressly label every portion of his analysis.  *See id.*  In short, the ALJ complied with the broad procedural requirements of Rulings 96-8p and 96-9p and based his RFC determination on substantial evidence.

    **2.**    **Substantial Evidence Supports the ALJ's Credibility Determination Adverse to Dr. Nortick, and the ALJ Properly Declined to Contact Dr. Nortick for Additional Evidence.**

Plaintiff correctly notes that the ALJ should give considerable weight to a treating physician's opinion in applying the pain standard and determining a claimant's RFC.  *See Crawford v. Comm'r*, 363 F.3d 1155, 1159 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436,

1440 (11th Cir. 1997).  Relying largely on this general rule, Plaintiff contends that the ALJ erred by (1) assigning diminished weight to Dr. Nortick's opinions, as expressed in the Clinical Assessment of Pain and Clinical Assessment of Fatigue/Weakness worksheets, and (2) substituting his own judgment for Dr. Nortick's in determining his RFC.

Plaintiff's arguments ignore the full scope of the relevant rule:  "It is well-established that the testimony of a treating physician must be given substantial or considerable weight *unless good cause is shown to the contrary*."  *Crawford*, 363 F.3d at 1159 (emphasis added).  Good cause to mitigate the weight given a treating physician's opinion arises where a report "is not accompanied by objective medical evidence or is wholly conclusory."  *Id*.  The ALJ may also reject a treating physician's opinion when it is directly contradicted by objective medical evidence. *Ellison v. Barnhart*, 355 F.3d 1272, 1275-76 (11th Cir. 2003).

In the instant case, the ALJ had good cause to devalue Dr. Nortick's opinion, and the ALJ sufficiently articulated that cause in his written decision:  "The only physician who has reported that [Plaintiff] had disabling pain or limitations is Dr. Nortick, but there is no evidence that he has treated [Plaintiff], nor [sic] that he has even examined [Plaintiff]."  (R. 26).  Expressed in terms of the *Crawford* standard, the ALJ discounted Dr. Nortick's conclusions because they were not accompanied by objective medical evidence (*i.e.*, supporting documentation).  *See* 363 F.3d at 1159.  The ALJ continued, stating:  "[Dr. Nortick also] reported that [Plaintiff]'s prescribed medication side effects could be expected to be severe and to limit effectiveness due to distraction, and attention, and drowsiness [sic], but [Plaintiff] takes no prescribed medication."  (R. 26).  Expressed in terms of the *Ellison* standard, the ALJ further discounted Dr. Nortick's conclusions because they were directly contradicted by objective medical evidence (*i.e.*, Plaintiff's lack of any prescription medication regimen).  *See* 355 F.3d at 1275-76.

In addition to this express consideration of Dr. Nortick's opinions, the ALJ also discussed in detail the host of other physicians' opinions in the record, all of which directly counter Dr. Nortick's conclusions.  Specifically, the ALJ cited the records of (1) Dr. Featheringill, who concurred with Dr. Johnson in finding "no reason for [Plaintiff] to have the non-anatomic complaints of pain that he had;" (2) Dr. Craddock, who identified no treatable lesions and referred Plaintiff for pain management; (3) Drs. Doleys and Columbia, who noted sufficient improvement in Plaintiff's condition to discontinue prescription of OxyContin products; and (4) Dr. Matic, who acknowledged Plaintiff's mobility problems but expressly declined to diagnose Plaintiff with disabling pain or limitations.  (R. 24).  Records from Plaintiff's interview with Dr. Belidleman, which relay Plaintiff's own account of his less-than-idle daily activities, further corroborate these conclusions.  In sum, the vast majority of objective medical evidence on record directly contradicts Dr. Nortick's responses to the questions on the pain and fatigue/weakness worksheets, and pursuant to the *Crawford* and *Ellison* standards, the ALJ properly discounted the weight assigned to Dr. Nortick's otherwise unsupported conclusions.

In addition to arguing that the ALJ improperly diminished the weight assigned to Dr. Nortick's opinions, Plaintiff further contends that the ALJ improperly substituted his own judgment for that of relevant medical authority in determining his RFC.  This proposition is not only erroneous, it is also misplaced.  As noted immediately above, the ALJ's determination of Plaintiff's RFC is, in fact, well grounded in the prevailing consensus of Plaintiffs' treating physicians, and the ALJ's decision to discount the outlying opinion of one physician is supported by controlling case law.  Second, and perhaps more importantly, the RFC finding is, by definition, *not* a medical assessment; rather, it is an administrative determination.  *See* 20 C.F.R. §§ 404.1527(e), 404.1545(a), 416.927(e), 416.945(a).  Given this distinction, the ALJ's

determination of Plaintiff's RFC should be informed by the record as whole, not just by the medical evidence of any one physician or group of physicians. *See Green v. Soc. Sec. Admin.*, 223 Fed. Appx, 915, 923 (11th Cir. 2007) (rejecting the argument that the ALJ had no basis for an RFC finding after discounting the opinion of a treating physician).

According to the Eleventh Circuit in *Green*, an ALJ may reject the opinion of a treating physician and rely on the remaining evidence—medical or otherwise—to determine a claimant's RFC. *Id.* at 924. Such was precisely the case here. The ALJ properly discounted the outlying, unsupported opinion of Dr. Nortick and relied on the remaining (substantial) evidence to determine Plaintiff's RFC.

In a final effort to resurrect the contents of Dr. Nortick's assessment worksheets, Plaintiff contends that the ALJ was obligated to contact Dr. Nortick for additional evidence. This argument, too, is misplaced. An ALJ may contact a treating physician for additional evidence only in the limited circumstances where the physician's records are inadequate. *See* 20 C.F.R. § 404.1512(e). According to the controlling regulation, records are inadequate only when (1) "the report from [the] medical source contains a conflict or ambiguity that must be resolved," (2) "the report does not contain all the necessary information," or (3) the report "does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Id.* Here, Dr. Nortick's forms contained no ambiguities, they lacked no necessary information, and they contained no description of potentially unacceptable techniques. As a result, the ALJ was under no obligation to contact Dr. Nortick for additional evidence.

By all appearances, it seems Plaintiff argues that the ALJ's determination adverse to Dr. Nortick's credibility implies by extension that Dr. Nortick's records were inadequate. Very simply, these two findings are not related. The ALJ discounted Dr. Nortick's opinion following

22

an exhaustive discussion of (1) the lack of objective evidence supporting Dr. Nortick's conclusions, and (2) the weight of substantial evidence contrary to those conclusions. Plaintiff may not mask his failure to satisfy the burden of proving his disability by casting as inadequate the only record (among dozens) that supports his position, thereby shifting the deficiency to the ALJ. Dr. Nortick's records were *unsupported* by, and *inconsistent* with, the record as a whole. Plaintiff offers no evidence or authority supporting the conclusion that Dr. Nortick's records were *inadequate* within the meaning of 20 C.F.R. § 404.1512(e). As such, the ALJ properly declined to contact Dr. Nortick for additional evidence.

## VII.   CONCLUSION

For the reasons stated, this court concludes that substantial evidence and good cause support the decision of the Commissioner and it is due to be affirmed. The court will enter a separate order.

**DONE** and **ORDERED** this _____22nd_____ day of May, 2012.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

23